# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

In the Matter of )
)
TAX PARCEL NOS. ) C.A. No. 2018-0733-PWG
WD-00-063.00-01-01.00-00001 and )
WD-00-063.00-01-34.00-00001 )

## MASTER'S REPORT

Date Submitted: January 4, 2022
Final Report: May 2, 2022

Nicole M. Faries, Esq., Mackenzie M. Peet, Esq., BAIRD MANDALAS BROCKSTEDT, LLC, Wilmington, Delaware, *Attorneys for Petitioner Janet Szelestei, Individually and as Trustee of the Steve Szelestei, Jr. Revocable Trust Dated August 14, 2009*

Gary R. Dodge, Esq., CURLEY, DODGE, FITZGERALD & FUNK, LLC, Dover, Delaware, *Attorney for Respondents James Melville and Nancy Melville*

**Griffin, Master**

Pending before me is an action by a landowner seeking to quiet title to approximately 13.5 acres of land that join her two separate properties. Alternatively, she seeks to establish title to the land by adverse possession. Neighboring landowners claim ownership of 3.6 acres encompassed within the approximately 13.5-acre parcel.

This dispute arises from the actions of certain individuals who were buying and selling land in western Kent County in the first decade of the twentieth century. They left in their wake a trail of deeds that provide little insight into the nature of those century-old transactions, and missing documentation of alleged conveyances, that are largely irreconcilable with the ownership claims for that property today.

On summary judgment, I found that there were material factual disputes concerning ownership of the 3.6-acre parcel at issue, due to the uncertainty created by those more than 100-year-old deeds. Although the parties made their best efforts to provide further clarity at trial, I regret to say that the issue of record ownership remains "clear as mud." However, I find that sufficient evidence was presented at trial to show one landowner adversely possessed the approximately 13.5-acre property, including the 3.6-acre parcel, through maintaining trails around and in the property and leasing it out for hunting for more than 20 years. This is a final master's report.

1

# I. Background[1]

At the center of this dispute is a 3.6-acre landlocked wooded parcel of land ("Disputed Parcel"), located west of Hartly in Kent County, Delaware. The Disputed Parcel is part of the hub between two neighbors' separate parcels of farmland: Petitioner Janet Szelestei ("Szelestei," and collectively with other members of her family "Szelesteis"), acting individually and as Trustee of the Steve Szelestei, Jr. Revocable Trust ("Trust"), owns properties to the north of the Disputed Parcel, on Ford's Corner Road, and to the south of it, on Butterpat Road. Respondents James and Nancy Melville ("Melvilles") own properties to the east of the Disputed Parcel, also fronting on Ford's Corner Road, and to the west, on Butterpat Road. The importance of the Disputed Parcel to both parties arises from its unique location – it lies between Szelestei's properties to its north and south, and between the Melvilles' properties to the east and west.

## A. *Deeds and Conveyances Related to the Properties*

On December 27, 1905, Nathaniel J. Williams and his wife ("Williamses") conveyed approximately 149 acres of land in West Dover Hundred ("Williams

---

[1] In this matter, I refer to the transcript of the evidentiary hearing that occurred on September 28, 2021 and September 29, 2021 as "Trial Tr." I refer to entries on the docket as "D.I." I refer to the Petitioner's trial exhibits as "Pet'r Tr. Ex." and the Respondents' trial exhibits as "Resp't Tr. Ex."

Tract") to Thomas Victor Clark ("Clark").[2]  The Williams Tract was further described as "adjoining on the east side of the public road going from Kenton to the Maryland line, lands of William Clough, [and] the lands of Nathaniel Williams and others."[3]  Clark conveyed 10 acres of this land to William Van DerWeild ("Van DerWeild Tract") on January 8, 1907,[4] and the remainder – described as 149 acres more or less in the deed – to Frank Shakespeare ("Shakespeare") on May 12, 1909.[5] Shakespeare conveyed his interest in the Williams Tract, along with other lands, to William S.H. Davis ("Davis") on June 16, 1909.[6]

On September 28, 1910, Davis conveyed by deed ("Portas Deed") to Louis Portas and his wife ("Portases"):

> All that certain plantation, tract, piece or parcel of land and premises situated in West Dover Hundred, Kent County and State of Delaware and lying on the Southeast side of the public road leading from Kenton to Maryland line adjoining the lands now or late of William Clough, lands now or late of Nathaniel J. Williams and lands of others and containing One Hundred and Twelve (112) acres of land be the same more or less and being all the land and premises which were conveyed in fee to Thomas V. Clarke by Nathaniel J. Williams and wife, excepting a small lot of land contracted for by Samuel E. Harris on September 23, 1907 containing fifteen acres … of land and also a small lot contracted to be sold to William Gibbs on September 12, 1907 containing eleven (11) acres, and also a small lot of ten (10) acres sold

---

[2] Pet'r Tr. Ex. 15.

[3] *Id.*

[4] Pet'r Tr. Ex. 16.

[5] Pet'r Tr. Ex. 17.

[6] Pet'r Tr. Ex. 18.

and conveyed by Thomas V. Clark to Warren Vanderweldt which deed is dated the eighth day of January A.D. 1907 …[7]

("Portas Tract"). Importantly, Davis excepted from the Portas Tract 15 acres contracted for by Samuel E. Harris ("Harris Tract") on September 23, 1907, 11 acres contracted to be sold to William Gibbs ("Gibbs") on September 17, 1907, and the Van DerWeild Tract.

### 1) Portas Tract

On July 15, 1936, the Portases conveyed the Portas Tract to Ludwig T. Schweitzer ("Schweitzer").[8] On April 7, 1966, Schweitzer and his wife conveyed the Portas Tract to Kathryn Louise Schweitzer Gunter.[9] On November 28, 1967, Kathryn Louise Schweitzer Gunter Demby and her husband ("Dembys") conveyed the Portas Tract to National Enterprises, Inc. ("N.E.").[10] On March 8, 1973, N.E. conveyed 13.35 acres of the Portas Tract to James Melville ("Melville") and Ronald Melville.[11] On December 28, 1984, Ronald Melville conveyed his interest in this 13.35 acres to Melville.[12]

---

[7] Pet'r Tr. Ex. 19.

[8] Pet'r Tr. Ex. 20.

[9] Pet'r Tr. Ex. 21.

[10] Pet'r Tr. Ex. 22.

[11] Pet'r Tr. Ex. 23.

[12] Resp't Tr. Ex. 7.

On July 31, 2012, N.E. conveyed by deed ("2012 N.E. Deed") 92.08 acres of the Portas Tract to the Melvilles, described with specificity through meets and bounds.[13] On January 10, 2013, N.E. conveyed to the Melvilles by quit claim deed ("2013 Quitclaim Deed") property identified as "Tax Parcel Number WD-00-063.00-01-34.00-000 and consisting of 3.60 acres, more or less" and "[b]eing the remainder of" land conveyed by the Dembys to N.E. (or the remainder of the Portas Tract.[14] In addition to these lands, Melville and other family members own a farm along Butterpat Road.[15]

2) <u>Van DerWeild Tract</u>

On June 28, 1941, William Vanderveild, a descendant of Warren Van DerWeild,[16] conveyed the Van DerWeild Tract to Steve Szelestei and his wife.[17] On

---

[13] Pet'r Tr. Ex. 25. In addition to the meets and bounds description, the conveyance was described as "[b]eing the same land and premises which … was granted and conveyed by … [the Dembys] unto National Enterprises, Inc." *Id.* And, on June 9, 1986, N.E. conveyed 2.8429 acres from the Portas Tract to Robert N. Wilkie and Dorothy M. Wilkie. *See* Pet'r Tr. Ex. 24.

[14] Pet'r Tr. Ex. 13.

[15] Resp't Tr. Ex. 4; Trial Tr. 343:7-17.

[16] The spelling of this family's name is inconsistent among the deeds. In an attempt for clarity, I use the spelling for each person as it appears in the earliest deed.

[17] Pet'r Tr. Ex. 2.

December 8, 2009, Steve Szelestei, Jr. conveyed the Van DerWeild Tract, along with another parcel, to the Trust.[18]

### 3) Harris Tract

On May 5, 1911, Davis conveyed the Harris Tract to Harris and his wife.[19] N.E. purchased the Harris Tract in a monitions sale in 1968.[20] The Harris Tract does not form part of the N.E. lands now held by the Melvilles.[21]

### 4) Gibbs Parcel

There is no evidence of a deed between Davis and Gibbs transferring the 11 acres identified in the Portas Deed as contracted to be sold to Gibbs ("Gibbs Parcel"),[22] nor of subsequent conveyances of that property from Gibbs, until Rachel Brown, an heir of Gibbs, executed a quitclaim deed on June 26, 1992 ("1992 Brown Deed").[23] She conveyed 11 acres "more or less" which were identified as a part of

---

[18] Pet'r Tr. Ex. 1; Pet'r Tr. Ex. 3. The other parcel encompassed approximately 110 acres of land adjoining Butterpat Road that was not part of the Williams Tract or the Portas Tract. *See* Pet'r Tr. Ex. 4.

[19] Resp't Tr. Ex. 2.

[20] Resp't Tr. Ex. 3; D.I. 48, Ex.

[21] Since the Melvilles only took from N.E. what N.E. acquired from the Dembys, they obtained no interest in lands conveyed to N.E. through the monitions sale deed. *See* Pet'r Tr. Ex. 25 ("being part of the same lands and premises which were conveyed unto [N.E.] … by deed of … [the Dembys]"); Pet'r Tr. Ex. 13 ("[b]eing the remainder of the lands which … [were] granted and conveyed by [the Dembys] unto [N.E.]").

[22] *See* Pet'r Tr. Ex. 19.

[23] Pet'r Tr. Ex. 6.

the lands transferred through the Portas Deed and as "the 11 acre parcel contracted to be sold to Williams Gibbs on September 12, 1907," to Steve Szelestei, Jr. and Janet Szelestei, who subsequently transferred that parcel to the Trust on December 8, 2009.[24]

## B. Szelestei's and Melville's Competing Ownership Claims

Both the Szelesteis and the Melvilles own lands adjoining Butterpat Road and Fords Corner Road that were not connected. The connecting parcel ("Connecting Parcel")[25] between their respective properties was land that they believed belonged to Gibbs or his heirs,[26] and they both wanted to acquire this land.[27] Although there was no recorded deed evidencing a conveyance to Gibbs, it appears Gibbs and his heirs paid property taxes on the Gibbs Parcel.[28] Beginning in 1973, Melville contacted Esther Mordecai ("Mordecai"), Gibbs' heir, who was listed as the owner of the Gibbs Parcel in tax records, seeking to acquire the Gibbs Parcel.[29] Melville testified that Mordecai responded that she "did not have good title" and refused to

---

[24] *Id.*; Pet'r Tr. Ex. 5.

[25] For purposes of this report, Connecting Parcel means both the Gibbs Parcel and the Disputed Parcel.

[26] *See* Trial Tr. 47:3-8; *id*. 331:15-21.

[27] *See id.* 44:20-45:4; *id*. 337:2-11 (negotiations between Melville and Esther Mordecai); *id*. 352:13-353:2.

[28] *Id.* 324:24-325:5.

[29] *Id.* 331:16-18; *id.* 337:2-11.

sell the property and that their communications ceased in 1986.[30]  In the mid-to-late 1980s, after checking property tax records to learn that Mordecai was listed as the owner of the Gibbs Parcel, Szelestei wrote to Mordecai to express interest in acquiring the property.[31]  After Mordecai died, Rachel Brown, Mordecai's heir, executed the 1992 Brown Deed.[32]  The Szelesteis believed that they had purchased the entire Connecting Parcel, including the Disputed Parcel, and hired a surveyor, Robert Larimore ("Larimore") in 1993 to draw a survey of the Connecting Parcel ("1993 Larimore Survey") but did not record the survey.[33]

The Szelesteis began licensing hunters to hunt on the entire Connecting Parcel in 1993.[34]  The Szelesteis and the hunters whom they licensed to hunt on the Connecting Parcel were allowed to hunt wild turkeys and deer during the hunting seasons specified by Delaware state law.[35]  The Szelesteis, or their licensed hunters, have maintained the trails, one of which is 10-12 feet wide, on the Connecting

---

[30] *Id.* 337:6-7; *id.* 352:13-353:2.

[31] *Id.* 44:23-45:3; *id.* 49:21-24.

[32] *Id.* 45:7-9; *id.* 46:12-14; *id*. 48:24-49:20.

[33] Pet'r Tr. Ex. 8; Trial Tr. 306:20-22.

[34] Trial Tr. 62:1-6. *See*, *e.g.*, Pet'r Tr. Ex. 28; Trial Tr. 122:10-23 (hunters paid Szelestei every year for hunting rights on the properties).

[35] Trial Tr. 106:14-107:11; *id.* 141:5-14.  The wild turkey season is in the spring and deer from September through January unless crop damage permits allowed hunting until April. *Id.* 107:5-8.

Parcel.[36] The hunters have put signs on the trails to ensure that none of the hunters cross into another's property and have maintained and marked their deer stands.[37]

After Melville acquired a portion of the Portas Tract in 1973 and was unable to purchase the Gibbs Parcel, he approached N.E. in 2000 about purchasing additional land it owned from the Portas Tract, but they were unable to negotiate a sale.[38] In 2012, N.E. contacted Melville and offered to sell the remainder of its holdings of the Portas Tract to Melville because it was closing its business.[39] Melville agreed to purchase whatever lands he could that were bounded by "good monuments."[40] Melville hired a surveyor, who relied on the monuments to plot a tract of land that did not include the Disputed Parcel.[41] The surveyor's description resulted in the 2012 N.E. Deed.[42] Melville testified he thought that he had purchased the whole property, including the Disputed Parcel, but the Tax Office assigned the

---

[36] *Id.* 89:15-20 ("We went through with a backhoe and removed the trees just off the property line."); *id*. 91:4-16; *id*. 132:9-15; *id*. 124:19-24; *id*. 125:13-15. Melville testified that the Szelesteis cut a trail over the Disputed Parcel starting in the early to mid-1990s. *Id.* 375:4-9. He also testified that he has used that trail. *Id.* 376:22-23. Further, the Melvilles' family and associates had a deer stand on the Disputed Parcel as early as 2001 that was located along the property line. *See id*. 397:9-398:14.

[37] *Id.* 107:24-108:12; *id*. 62:16-20. I observed a sign marking the hunters' deer stand on the Disputed Parcel when I conducted a site visit of the property.

[38] *Id.* 351:4-10

[39] *Id.* 353:21-354:4.

[40] *Id.* 354:23-355:16.

[41] *Id*.; Pet'r Tr. Ex. 25.

[42] Trial Tr. 356:5-14.

Disputed Parcel to an unknown owner.[43] Melville then contacted N.E. again and negotiated the 2013 Quitclaim Deed, and the Tax Office then assigned the Disputed Parcel to him.[44]

Brian Costa ("Costa"), a technician responsible for maintaining tax maps for the Kent County tax assessment office ("Tax Office"), testified that the Tax Office tracks land ownership for assessment purposes, with the goal of ascertaining a property's acreage for tax purposes.[45] He further testified that the maps maintained by the Tax Office are constantly being adjusted as new deeds and surveys are recorded.[46] Where there are conflicts among deeds, he testified that Tax Office officials will generally attempt to get more information and will not make adjustments on the maps.[47] He further testified that tax maps are "not survey accurate."[48]

The Tax Office assigned the Gibbs Parcel to Gibbs, and it appears Gibbs, and/or his heirs, paid taxes on it.[49] At one point, the Tax Office had assigned the

---

[43] *Id*. 356:17-23; *id*. 359:8-17.

[44] *Id*. 359:8-18; Pet'r Tr. Ex. 13; Trial Tr. 318:19-319:1.

[45] Trial Tr. 301:2-8; *id*. 316:9-12.

[46] *Id.* 300:6-19.

[47] *Id*. 300:23-301:2.

[48]  *Id*. 305:21-22.

[49] *Id*. 305:1-3; *id.* 324:14-325:5.

Disputed Parcel to the Portas Tract,[50] but upon receiving an additional survey related to the 2012 N.E. Deed,[51] the Tax Office created a new tax map parcel and listed the Disputed Parcel with an unknown owner.[52] Costa testified that if the 1993 Larimore Survey had been recorded, the Tax Office would have noted on the tax map that ownership of the Disputed Parcel was disputed and, when the new parcel was created in 2012, the Tax Office would have defaulted to the 1993 Larimore Survey and attributed 13.55 acres to Szelestei.[53]

The Melvilles' and Szelestei's competing ownership claims to the Disputed Parcel have caused difficulties between these longstanding neighbors, resulting in what Melville termed as "pleasant unpleasantness."[54] Melville testified, in earlier times, "there weren't many boundary issues" concerning these properties.[55] But, disputes emerged when the Melvilles claimed the Disputed Parcel under the 2013 Quitclaim Deed, and subsequently planted trees on the Disputed Parcel.[56] Melville encountered some of Szelestei's hunters on the Disputed Parcel.[57] Melville was not

---

[50] Trial Tr. 303:8-19; *id.* 317:7-12; D.I. 48, at JS-003.

[51] *See* Pet'r Tr. Ex. 11; Trial Tr. 306:23-307:17.

[52] Trial Tr. 304:1-10.

[53] *Id.* 306:2-13.

[54] *Id.* 377:1-2.

[55] *Id.* 370:5-7.

[56] *Id.* 362:21-24; *id.* 363:9-14.

[57] *See id.* 368:21-369:18.

necessarily opposed to these hunters on the Disputed Parcel due to deer overpopulation,[58] but he did move some of the hunters off of the Disputed Parcel onto what he considered to be Szelestei's property.[59] In 2017, the Trust, through its attorney, asked Melville to remove a deteriorating deer stand from the Disputed Parcel.[60] Attached to the letter was the 1993 Larimore Survey of the Connecting Parcel.[61] The Melvilles communicated with the Trust's attorney regarding their property claims, which led to this dispute.[62]

## C. Procedural History

On October 11, 2018, Szelestei, as trustee of the Trust, filed a petition to quiet title on the Connecting Parcel, including the Gibbs Parcel and the Disputed Parcel, claiming to have obtained title to the Connecting Parcel through the 1992 Brown Deed.[63] Szelestei also asserts that her family has adversely possessed the Connecting Parcel since at least 1992, by permitting persons to hunt on that property and maintaining a path over the Connecting Parcel to connect her two properties. Further, she asks for attorneys' fees under the bad faith exception.

---

[58] *Id*. 369:6-10.

[59] *Id*. 372:19-24.

[60] *See* Resp't Tr. Ex. 6; Trial Tr. 419:6-18.

[61] Trial Tr. 364:15-365:1.

[62] *Id.* 365:7-12.

[63] D.I. 1.

12

In the Melvilles' November 13, 2018 answer and counterclaim, they deny Szelestei's ownership claims, assert that they have good title to the Disputed Parcel through the 2013 Quit Claim Deed, and seek attorneys' fees.[64]

Following discovery, Szelestei filed a motion for summary judgment, on December 31, 2019, seeking invalidation of the 2013 Quit Claim Deed and arguing that the recorded deeds and historical property boundary markers show that she is the owner of the Connecting Parcel.[65] The Melvilles, in their January 31, 2020 answering brief, asserted that they own the Disputed Parcel through the Portas chain of title, and that the surveys and monuments do not support Szelestei's claims.[66] On March 31, 2020, I issued a final report denying the summary judgment motion, holding that the lack of clarity in the deeds left issues of material fact to be determined at trial.[67] The Court adopted the final report on April 14, 2020.[68]

With the motion for summary judgment, Szelestei also filed a motion in limine to exclude the Melvilles' expert's report at trial.[69] Following my report on summary judgment, the Melvilles indicated that the motion in limine was not opposed, and I

---

[64] D.I. 7.

[65] D.I. 21.

[66] D.I. 25.

[67] D.I. 27.

[68] D.I. 28.

[69] D.I. 22.

granted that motion.[70] This issue was further discussed at the September 16, 2021 pre-trial conference and later resolved through agreement by the parties.[71]

A two-day trial was held in this matter on September 28, 2021 and September 29, 2021.[72] The parties supplemented the record on October 6, 2021.[73] At the parties' request, I conducted a site visit of the Connecting Parcel and adjoining properties on December 13, 2021. The parties submitted simultaneous written closing arguments on January 4, 2022.[74]

## II.    Analysis

### A. *Parties' Contentions*

Szelestei argues that she has proven legal title because (1) she has shown, by a preponderance of the evidence, the existence of a missing deed giving Gibbs' ownership of the entire Connecting Parcel, and substantial evidence of the contents of that deed,[75] (2) the physical monuments—the stones, iron pipe, and the iron

---

[70] D.I. 31; D.I. 32.

[71] D.I. 38. At the pre-trial conference, the parties indicated that they could resolve the issue addressed in the motion in limine. D.I. 38. However, following that conference, Szelestei requested guidance from the Court concerning the implementation of the granted motion in limine. D.I. 39. At the September 23, 2021 hearing, the parties agreed that the expert's report would be excluded from evidence at trial but that certain demonstrative exhibits could be used based upon the expert's surveys. D.I. 45.

[72] D.I. 46.

[73] D.I. 47.

[74] D.I. 52; D.I. 53.

[75] D.I. 53, at 2-8, 19-20.

axle—depict the property boundaries of the Connecting Parcel, which is referenced as the Gibbs holding in the Portas Deed,[76] and (3) the use, or non-use, of the term "more or less" in deeds has no significance in the Portas Deed and no bearing on the acreage being conveyed.[77] Alternatively, she contends that she has proven adverse possession of the Connecting Parcel because she has acted as if the Connecting Parcel was exclusively owned by her since 1992, by cutting trails and renting the land out to hunters.[78]

The Melvilles assert that they have good title in the Disputed Parcel through their chain of title, relying on (1) the lack of evidence that there was a deed from Davis to Gibbs,[79] (2) that the 1988 Spec Plan shows that the Disputed Parcel was part of the Portas property, not the Gibbs property,[80] and (3) the use of the term "more or less" with the conveyance to the Portases, and not with the other descriptions of conveyances, in the Portas Deed means that the Disputed Parcel passed to the Portases.[81] The Melvilles also contend that Szelestei has not proven adverse possession because the Szelesteis never attempted to exclude others from

---

[76] *Id.*, at 8-12.

[77] *Id.*, at 14-18.

[78] *Id.*, at 21-24.

[79] D.I. 52, at 7, 12.

[80] *Id.*, at 8-12; *see* D.I. 47. The 1988 Spec Plan was taken from a 1988 Spec Print book created by a company which compiled Kent County tax maps. Trial Tr. 297:2-298:10.

[81] D.I. 52, at 14-16.

the Disputed Parcel and both parties accessed the Disputed Parcel and used it for

hunting, and that they, and their predecessors in interest, paid taxes on it.[82]

*B. Record Title*

Both parties contend that they have good legal title to the Disputed Parcel

through the chain of title contained in their deeds. Parties "seeking to remove a

cloud on title must prevail on the strength of their own titles and may not rely on the

weakness of another's title."[83] The standard for proving legal title, in this instance,

is preponderance of the evidence.[84]

In a dispute involving deeds, the "construction of a deed is a question of law

upon which the court must rule."[85] "The fundamental rule in construing a deed is to

ascertain and give effect to the intent of the parties as reflected in the language they

selected."[86] The "scope and extent of a grant [of land] contained in a deed depends

---

[82] *Id.*, at 17-20.

[83] *Smith v. Smith*, 622 A.2d 642, 646 (Del. 1993) (citation omitted); *see also State v. Sweetwater Point, LLC* [hereinafter *Sweetwater Point*], 2017 WL 2257377, at *8 (Del. Ch. May 23, 2017).

[84] *See Sweetwater Point,* 2017 WL 2257377, at *8; *see also ABC Woodlands, LLC v. Shreppler*, 2012 WL 3711085, at *2 (Del. Ch. Aug. 15, 2012). Because only the Melvilles were named as respondents in this matter, and the Court never ordered service by publication or posting, I conclude that this is an *in personam* action and the applicable standard of proof is preponderance of the evidence. *See* D.I. 1; D.I. 4.

[85] *Rohner v. Niemann*, 380 A.2d 549, 552 (Del. 1977) (citations omitted); *see also Smith*, 622 A.2d at 645.

[86] *Smith*, 622 A.2d at 646; *see also Phillips v. State, ex rel. Dep't of Nat. Res. & Envtl. Control*, 449 A.2d 250, 253 (Del. 1982) (citations omitted); *Sweetwater Point,* 2017 WL 2257377, at *8.

upon the meaning of the language of the deed, and where that language contains ambiguities the deed must be read in the light of the intent of the parties as determined by the facts and circumstances surrounding the transaction."[87] Ambiguities are resolved "in favor of the grantee so long as such a construction does not violate any apparent intention of the parties to the transaction."[88]  However, a "grantor can convey only such title and interest in land that he actually owns."[89]  In construing deed language, there is an order of preference involving various factors: calls "to natural monuments take the first priority, then to artificial monuments, then to courses of distances, then to acreage.  Calls to adjoiners [or adjoining properties] are akin to calls to artificial monuments."[90]  However, this order of preference is not "absolute" but a tool to be used in ascertaining the parties' intent.[91]

1. Szelestei has not Proven Record Title

Szelsetei's chain of title rests upon a lost deed that conveyed the approximately 13.5 acres of the Connecting Parcel to Gibbs, which she claims

---

[87] *Rohner*, 380 A.2d at 552.

[88] *Smith*, 622 A.2d at 646 (citing *Rohner*, 380 A.2d at 552); *Richard Paul, Inc. v. Union Imp. Co.,* 91 A.2d 49, 53 (Del. Ch. 1952) (citation omitted).

[89] *Scureman v. Judge,* 626 A.2d 5, 16 (Del. Ch. 1992) (citation omitted), *aff'd sub nom. Wilmington Tr. Co. v. Judge*, 628 A.2d 85 (Del. 1993) (TABLE); *see also ABC Woodlands, LLC*, 2012 WL 3711085, at *4.

[90] *Sweetwater Point*, 2017 WL 2257377, at *8; *see also McCabe v. Wilson*, 1986 WL 15429, at *10 (Del. Super. Dec. 10, 1986).

[91] *Sweetwater Point*, 2017 WL 2257377, at *8.

17

included the Disputed Parcel. Both parties attempted to purchase the Gibbs Parcel from Gibbs' heirs in the past.[92] But, the parties disagree whether the Disputed Parcel was conveyed to Gibbs.

I consider what standard of proof to apply in this case for proving a lost or missing deed. Szelestei argues that the burden to prove the execution and delivery of a missing deed is preponderance of the evidence.[93] Although more than a century old, the Superior Court in *Hitchens v. Ellingsworth* held that

> Parol evidence is admissible to show the execution and contents of a lost deed, but such evidence to establish the contents should be clear and certain. It should show, by the preponderance of the evidence, that the deed was properly executed with the formalities required by law, and should show the contents of the deed not literally but substantially.[94]

---

[92] *See supra* notes 29-32 and accompanying text. Both parties appeared to acknowledge that Gibbs owned the Gibbs Parcel at some point in the past. Trial Tr. 44:23-45:3; *id.* 422:10-15.

[93] D.I. 53, at 2.

[94] *Hitchens v. Ellingsworth*, 94 A. 903, 904 (Del. Super. 1915); *see also Bartholomew v. Edwards*, 6 Del. 247, 250 (Del. Super. 1856) ("The previous existence and subsequent loss of the deed are first to be proved to the satisfaction of the Court; and afterwards the evidence of its contents is addressed to the [finder of fact]; and to do this, the existence and identification of the deed as a deed, and the parties to it, must be sufficiently proved to the Court, before the secondary evidence as to its contents can be allowed to go to the [finder of fact].") Both *Hitchens* and *Bartholomew* address the standard of proof in the context of a jury trial on the issue of a lost deed – they provide that the judge decides whether the evidence proves the existence of the lost deed before the issue of the deed's contents is submitted to the jury. Other jurisdictions are "apparently unanimous in holding that something more than the degree of proof required in an ordinary civil action is exacted in cases involving the proof of the former existence and contents of a lost instrument." Comment, *Degree or Quantum of Evidence Necessary to Establish a Lost Instrument*, 148 A.L.R. 400 (originally published in 1944) (collecting sources and citing *Hitchens*, 94 A. 903); *see also* 52 Am. Jur. 2d Lost and Destroyed Instruments § 33 (2022).

Applying the approach articulated in *Hitchens*, I first consider whether the evidence shows, by a preponderance of the evidence, that the lost deed was executed and then whether the evidence establishing the lost deed's contents was clear and certain. "Proof by a preponderance of the evidence means proof that something is more likely than not."[95] "[I]f the evidence is in equipoise the party carrying the burden will lose."[96]

Here, Szelsetei has not met her burden – she has not shown proof that the deed conveying the Gibbs Parcel to Gibbs was ever executed. The only reference to a sale of the Gibbs Parcel to Gibbs is the Portas Deed, which excepts "a small lot contracted to be sold to William Gibbs on September 12, 1907 containing eleven (11) acres" from the conveyance creating the Portas Tract.[97] This references a contract for the sale of land and provides no evidence that the Gibbs Parcel was ever conveyed to Gibbs.[98] The language "lot contracted to be sold" related to the Gibbs Parcel is similar to the language used to describe "a small lot of land contracted for by … Harris."[99] After the Portas Deed in 1910, Davis conveyed the Harris Tract to

---

[95] *In re Coinmint, LLC*, 261 A.3d 867, 888 (Del. Ch. 2021) (internal quotation marks and citations omitted).

[96] *Id.* (internal quotation marks and citations omitted).

[97] Pet'r Tr. Ex. 19.

[98] *See* Trial Tr. 324:7-12.

[99] Pet'r Tr. Ex. 19.

Harris and his wife in 1911.[100]  Unlike the later Harris Tract conveyance, there is no evidence that the Gibbs Parcel was ever conveyed to Gibbs.[101]  And, there was language in the Portas Deed excluding land "sold and conveyed by" Clark to Van DerWeild in a deed dated January 8, 1907.[102]  If the Gibbs Parcel had been sold to Gibbs prior to the execution of the Portas Deed, it would be consistent for that deed to refer to it as land previously "sold and conveyed."  It appears that the Tax Office assigned the Gibbs Parcel to Gibbs or his heirs.[103]  But, Mordecai indicated to Melville that she did not have good title to the land and, as a result, she could not "do anything with that property."[104]  Because Szelestei has not shown, by a preponderance of the evidence, the existence of a deed conveying the Gibbs Parcel to Gibbs, I deny her claim that she has proven record title to the Gibbs Parcel and the Disputed Parcel.[105]

---

[100] Resp't Tr. Ex. 2.

[101] Despite the plain language of the Portas Deed reading that the lot was "contracted to be sold" to Gibbs, Szelestei argues that the timing of the Portas Deed suggests that a deed had already been executed to Gibbs. D.I. 53, at 3-4.  I find this is not a reasonable inference to draw from the plain language of the Portas Deed.

[102] Pet'r Tr. Ex. 19.

[103] *See* Trial Tr. 326:17-327:1; *id*. 324: 7-12 ("See, that was the funny thing about the whole area.  I never could find a deed for William Gibbs.  It was actually reference din other deeds that surround it, saying that the land was to be sold to William Gibbs for -- as 11 acres. But I could never find a deed for it."). The Tax Office attributed 11 acres to Gibbs. *Id*. 305:1-3.

[104] *Id*. 352:13-19.

[105] Since I find that Szelestei has not proven the existence of the lost deed conveying the Gibbs Parcel to Gibbs by a preponderance of the evidence, I do not need to address the

20

## 2. The Melvilles have not Proven Record Title

The Melvilles must prove the strength of their record title to the Disputed Parcel. They argue that, through their chain of title, they get any remainder of the 149-acre Williams Tract and that the Disputed Parcel was part of the land conveyed to the Portases through the Portas Deed.[106]

Through their chain of title, the Melvilles obtained the Portas Tract, which is described, in the Portas Deed, as land "lying on the Southeast side of the public road leading from Kenton to Maryland line adjoining the lands now or late of William Clough, … Nathaniel J. Williams and lands of others" and containing 112 acres of land "be the same more or less and being all of the land" of the Williams Tract,

> excepting a small lot of land contracted for by Samuel E. Harris on September 23, 1907 containing fifteen acres … and also a small lot contracted to be sold to William Gibbs on September 12, 1907 containing eleven (11) acres, and also a small lot of ten (10) acres sold and conveyed by Thomas V. Clark to Warner Vanderveldt which deed is dated the eighth day of January A.D. 1907 and of record in the Recorder's Office at Dover . . .[107]

The order of preference in construing deed language begins with calls to natural monuments, then artificial monuments, including to adjoiners, or adjoining properties, followed by course of distances, and acreage, which is a tool for

---

question of, or the standard that applies to proving the contents of such a deed. *See Hitchens v. Ellingsworth*, 94 A. 903, 904 (Del. Super. 1915).

[106] D.I. 52, at 12-16.

[107] Pet'r Tr. Ex. 19.

interpreting the parties' intent.[108]  Thus, to understand the land that the Melvilles hold through their chain of title, it is necessary to understand what land was conveyed through the Portas Deed, as well as the location of the land that was excepted from that conveyance – the lands contracted for sale to Gibbs and Harris, and the land previously sold to Van DerWeild.

The difficulty here is that the Portas Deed offers very little guidance from which the Court can discern the location of the land conveyed and the lands excepted from that conveyance.  It contains no calls to natural monuments or courses of distance and its only references are to artificial monuments – a road and adjoining properties – and to acreage.

During the trial, witnesses identified various stones and markers purported to be on the boundaries of the properties, which roughly align with what the parties agree constitute some of the boundaries of their properties.[109]  Stones and markers on certain boundaries are reflected on previous surveys of the Connecting Parcel or adjoining properties, including a 1993 Larimore survey, which shows an axle and pipe at the boundaries on one end and two stones at the other end of the Connecting Parcel;[110] a 2012 survey prepared by Julian Marvel ("Marvel") of the N.E. lands

---

[108] *See supra* notes 90-91 and accompanying text.

[109] *See, e.g.,* Trial Tr. 98:15-99:12; *id.* 120:23-121:5; *id.* 181:10-184:10; *id.* 354:23-355:16.

[110] Pet'r Tr. Ex. 8.

being conveyed to Melville, which shows an axle and pipe at one end, and a stone one of the other ends of the Connecting Parcel;[111] and a 2019 Marvel survey of the Melvilles' property closest to Butterpat Road, which shows a pipe and a stone on two of the boundaries of the Connecting Parcel.[112] Melville testified that he thought all of the stones were his survey stones.[113] Larimore, Szelestei's expert witness, testified that he believed the stones had been intentionally placed at the boundaries between 150 and 200 years ago and the pipe at least 20 years ago.[114]

However, the Portas Deed, or other deeds in the chain of title, do not reference these stones and markers. Although artificial monuments can be used to mark property boundaries,[115] their use in interpreting a deed's language is limited if they are not referenced in a controlling deed, or cannot be otherwise tied to the facts and circumstances of the conveyance reflected in the deed.[116] While the stones and markers appear to have been adopted, in some part, by subsequent grantees of

---

[111] Pet'r Tr. Ex. 11. The 2012 Marvel survey does not show one of the Connecting Parcel's boundaries. *Id.* It further shows the Connecting Parcel as the "lands now or formerly of Steve Szelestei Jr. (Trustee)." *Id.*

[112] Resp't Tr. Ex. 4.

[113] Trial Tr. 358:4-8.

[114] *Id.* 181:11-183:24.

[115] *See Sweetwater Point*, 2017 WL 2257377, at *8 (Del. Ch. May 27, 2017); *McCabe v. Wilson*, 1986 WL 15429, at *10 (Del. Super. Dec. 10, 1986).

[116] *See Rohner v. Niemann*, 380 A.2d 549, 552 (Del. 1977) (ambiguities in deeds are resolved in light of the "facts and circumstances of the transaction").

adjoining properties, including the Szelesteis and the Melvilles, the evidence does not tie them as boundary markers for land conveyed in the early twentieth century deeds at issue.

In addition, the Portas Deed and other deeds in the chain of title describe the land being conveyed as lying on a "public road going from Kenton to the Maryland line."[117] Calls to roads are calls to artificial monuments.[118] This call is ambiguous, since, at this point, neither Fords Corner Road nor Butterpat Road run directly from Kenton to the Maryland border. There was testimony that another road once existed in that area, but its exact location is unclear.[119]

Next, I consider calls to adjoiners or adjoining property. The Portas Deed refers to the adjoining lands "now or late of William Clough, … Nathaniel J. Williams and lands of others."[120] The interpretation of calls to adjoiners "requires considerable collateral showing as to the location of the adjoiners named, and then

---

[117] Pet'r. Tr. Ex. 15 ("east side of the public road going from Kenton to the Maryland line"); Pet'r Tr. Ex. 16 ("on the public road leading from Kenton to the Maryland line"); Pet'r Tr. Ex. 17 ("South east side of the public road leading from Kenton to the Maryland line"); Pet'r Tr. Ex. 18 ("south-east side of the public road leading from Kenton to the Maryland line"); Pet'r Tr. Ex. 19 ("Southeast side of the public road leading from Kenton to the Maryland line"); Pet'r Tr. Ex. 20 ("southeast side of the public road leading from Kenton to Maryland line"); Pet'r Tr. Ex. 21 ("southeast side of the public road leading from Kenton to Maryland line"); Pet'r Tr. Ex. 22 ("southeast side of the public road leading from Kenton to Maryland line");

[118] *See* 4 Tiffany Real Property § 993 (3d ed.) (2021).

[119] Trial Tr. 74:3-24; *id.* 142:11-13.

[120] Pet'r Tr. Ex. 19.

considerable checking to ascertain that their respective boundaries enclose and correctly describe the land to which title is being examined."[121]  Since the evidence does not show the location of adjoining lands referenced in the Portas Deed, these calls are not helpful.  Further, there are no courses of distance contained in the Portas Deed, and it is not until relatively recently that an adjoining property's deed included a description based on courses and distances.[122]

The Portas Deed does contain calls to acreage.  "[O]f all the indicia by which boundaries of land are to be ascertained that of quantity is held perhaps the least reliable."[123]  The Portas Deed describes the land being conveyed to the Portases as all of Clark's property that was owned by Davis, consisting of 112 acres "more or less," except for three parcels of land that were excepted (Gibbs Parcel, Harris Tract, and Van DerWeild Tract),[124]

---

[121] 1 Patton and Palomar on Titles § 128 (3d ed.) (2021). *See Sweetwater Point*, 2017 WL 225377, at *9-23 (Del. Ch. May 23, 2017) (detailed discussion of each call to adjoiner and related deeds).

[122] The first deed of any neighboring property to include a description based on courses and distances was the 1973 conveyance of 13.35 acres between N.E. and the Melvilles. *See* Pet'r Tr. Ex. 23.  The first survey of the Gibbs Parcel was completed in 1993 and depicted 13.55 acres based on monuments, courses and distances. Pet'r Tr. Ex. 8.  However, the recorded deeds of the Gibbs Parcel and the Disputed Parcel depict calls only to adjoiners, acreage, and, in 2013, by reference to a tax parcel number. *See* Pet'r Tr. Ex. 6; Pet'r Tr. Ex. 13.

[123] 1 Patton and Palomar on Titles § 158 (3d ed.) (2021) (internal quotation marks and citations omitted).

[124] Pet'r Tr. Ex. 19.

The Melvilles argue that the omission of the phrase "more or less" for the excepted parcels compared to its inclusion for the conveyance to the Portases, means that only the exact acreage specified for the excepted parcels was not conveyed to the Portases. They assert that, since the Gibbs Parcel was described as 11 acres and the land claimed by Szelestei (the Gibbs Parcel and the Disputed Parcel) exceeds that acreage, the Disputed Parcel transferred to the Portases through the Portas Deed.[125]

I disagree with the Melvilles' argument that the use of "more or less" in referencing the quantity of acreage in one conveyance, while omitting it in other references, reflected the parties' differing intent for the conveyances in the Portas Deed.[126] It has been held that, in modifying a quantity term for a deed, the phrase "more or less" accounts for "only minor inaccuracies in measurement."[127] Larimore testified that the phrase "more or less" is used "in every deed" when quantifying acreage and, when asked how he would interpret the omission of "more or less" in certain descriptions in a deed, he responded "[s]omebody just forgot to say 'more or less.'"[128]

---

[125] D.I. 52, at 15.

[126] *See id.*, at 20-22.

[127] *Pryde v. Delmarva Power & Light Co.*, 2009 WL 388942, at *4 (Del. Super. Feb. 17, 2009).

[128] Trial Tr. 195:21-196:12.

The parties' intent in using the phrase "more or less" in one instance and omitting it in others in the Portas Deed is not clear. The Harris Tract, which was described as 15 acres in the Portas Deed without the phrase "more or less,"[129] was subsequently described as "18 acres of land more or less," when Davis sold the land to Harris in 1911.[130] So, in that instance, Davis (the grantor in both conveyances) did not intend that the acreage excepted from the Portas conveyance to be sold to Harris was exact; indeed, there was a difference of three acres. Further, if the phrase "more or less' accounts for only minor inconsistencies in measurement, then it would not support adding 3.6 acres – not a minor inconsistency – to the Portases' lands. I conclude that the evidence does not show that the parties intended to mandate the exactness of the acreage being transferred through the use, or non-use, of the phrase "more or less."

The Melvilles also rely on the 1988 Spec Plan to show that the Disputed Parcel was part of the Portases' property and not the Gibbs Parcel.[131] The 1988 Spec Plan depicted the Gibbs Parcel as 11 acres and included the Disputed Parcel in an adjacent 98.7-acre tax parcel owned by N.E.[132] It is undisputed that N.E. paid taxes on the

---

[129] Pet'r Tr. Ex. 19.

[130] Resp't Tr. Ex. 2. Indeed, the Melvilles in their closing memorandum acknowledge this and other inconsistencies in acreage descriptions among the deeds that are relevant to this matter. *See* D.I. 52, at 3; *id.*, at 4 n. 3; *id.* at 15 n. 10.

[131] D.I. 52, at 12.

[132] D.I. 47.

Disputed Parcel while it owned the adjacent parcel.[133]  However, when the Tax Office reviewed the survey related to the 2012 N.E. Deed, which did not include the Disputed Parcel in the land transferred to the Melvilles, it created a new tax parcel for the Disputed Parcel and listed it with unknown owner, which precipitated the Melvilles obtaining the 2013 Quitclaim Deed from N.E. for the Disputed Parcel.[134] Costa testified that the Tax Office tracks land ownership only for tax assessment purposes and that tax maps are "not survey accurate."[135]  He also testified that, if the 1993 Larimore Survey reflected that the Gibbs Parcel owned by Szelestei was 13.55 acres, the tax map would have noted the ownership dispute and when the new parcel was created, the 13.55 acres would have been attributed to Szelestei.[136]  The 1988 Spec Plan did not include the Disputed Parcel as a part of the Gibbs Parcel.  Although tax payment on a property is an indicia of ownership,[137] the tax maps reflected in the 1988 Spec Plan are not survey accurate and are not determinative of land ownership, especially considering the unusual circumstances surrounding the Disputed Parcel.

Here, the passage of time and a lack of clarity in the controlling deeds greatly hinders the ability to ascertain the parties "intent—the controlling consideration in

---

[133] Resp. Tr. Ex. 8; Trial Tr. 318:13-18.

[134] *See* Pet'r Tr. Ex. 13; Trial Tr. 356:19-357:4.

[135] Trial Tr. 301:2-8; *id.* 305:20-22.

[136] *Id*. 306:2-19.

[137] *See Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Super. Aug. 31, 2007).

any determination of conveyances."[138] It is not unusual in property disputes that "the passage of time obscures the relevant facts."[139] In this analysis, the intent that I am called upon to effectuate is that of parties from over 100 years ago, each of whom has long since passed away. While I commend both parties for their admirable efforts to give meaning to these conveyances, I cannot ascertain, based on the record before me, the true intentions of those parties. Little evidence was presented that would give meaning to the calls contained in the Portas Deed, or other related deeds. It may be that the early twentieth century parties involved had relationships which ensured that they understood, among themselves, the full meaning of their property transactions. However, based upon the evidence available today, I cannot reconstruct that intent and understanding with sufficient certainty to conclude that the Melvilles obtained record ownership to the Disputed Parcel, and I deny their claim.

## C. Adverse Possession

Szelestei contends that she has established title to the Connecting Parcel, encompassing both the Gibbs Parcel and the Disputed Parcel, through adverse

---

[138] *Sweetwater Point*, 2017 WL 2257377, at *8 (Del. Ch. May 27, 2017) (citing 4 Tiffany Real Property §§ 993, 997 (3d ed.)).

[139] *Savage v. Barreto*, 2013 WL 3773983, at *6 n. 48 (Del. Ch. July 17, 2013).

possession.[140] The Melvilles do not generally contest Szelestei's title to the Gibbs Parcel, but deny Szelestei's claim to the Disputed Parcel.[141]

"To establish title by adverse possession therefore, [Szelestei] must show, by a preponderance of the evidence: (1) open and notorious, (2) hostile and adverse, (3) exclusive, (4) actual possession, (5) that was continuous for twenty years."[142] The burden of proof for adverse possession is preponderance of the evidence.[143] "Acts indicative of ownership vary according to the nature of the land. The land need only be used as other owners of similar land would use land of that type, and only in such a manner as is practicable or to be expected."[144]

As background, both the Disputed Parcel and the Gibbs Parcel are landlocked, densely forested parcels of land that appear to have limited economic value or potential for cultivation.[145] Their main use appears to be for hunting.[146] These observations were confirmed by my site visit of the Disputed Parcel and the Gibbs

---

[140] D.I. 1, at ¶¶ 20-22.

[141] D.I. 7, ¶ 27; D.I. 52, at 17-20.

[142] *Tumulty v. Schreppler*, 132 A.3d 4, 24 (Del. Ch. 2015).

[143] *Id.*

[144] *Edwards v. Estate of Muller*, 1993 WL 489381, at *13 (Del. Ch. Oct. 18, 1993).

[145] *See* Trial Tr. 61:9-23; *id*. 333:1-3; *id*. 338:22-23; *see also* D.I. 52, at 17. This was confirmed by my visit to the properties.

[146] Trial Tr. 61:9-23.

Parcel. Parts of the Disputed Parcel, in particular, are swampy, which impedes other uses and efforts to create paths through those portions of the property.[147]

### 1. Continuous Possession for Twenty Years

The twenty-year continuous possession requirement "is a bright-line inquiry."[148] The issues that most often arise out of this requirement is determining when the twenty-year period begins.[149] The Szelesteis recorded a deed that she argues conveys both the Gibbs Parcel and the Disputed Parcel in 1992.[150] They hired a surveyor in 1993 to draw a survey of the Connecting Parcel,[151] and began licensing hunters to hunt on both properties—the Gibbs Parcel and the Disputed Parcel—in 1993.[152] I find that the Szelesteis began asserting ownership over the Connecting Parcel in 1992 or 1993, so the requisite 20-year period ran well before Szelestei filed the Petition on October 11, 2018.[153]

---

[147] *Id.* 112:9-113:1.

[148] *Tumulty v. Schreppler*, 132 A.3d 4, 24 (Del. Ch. 2015).

[149] *See id.*

[150] Pet'r Tr. Ex. 6.

[151] Pet'r Tr. Ex. 8.

[152] Trial Tr. 62:1-6. *See*, *e.g.*, Pet'r Tr. Ex. 28; Trial Tr. 122:10-23 (hunters paid Szelestei every year for hunting rights on the properties).

[153] D.I. 1. For completeness' sake, I address the effect of the transfer of the Szelesteis' interest in the parcels to the Trust on December 8, 2009. Pet'r Tr. Ex. 5. Since they conveyed their rights in the parcels to the Trust, and there is no evidence of any lapse in use during the relevant period, the doctrine of tacking applies and this transfer does not disturb the twenty-year period required for adverse possession. *See Marvel v. Barley Mill Road Homes*, 104 A.2d 908, 913-14 (Del. Ch. 1954).

2. Open and Notorious Possession

"Open and notorious means that the possession must be public so that the owner and others have notice of the possession. If possession was taken furtively or secretly, it would not be adverse and no title possession could be acquired."[154] "[W]hat constitutes open and notorious use of land depends on the properties and characteristics of the land in question."[155]

Szelestei has proven open and notorious possession of both the Disputed Parcel and the Gibbs Parcel by a preponderance of the evidence. The Szelesteis began selling hunting rights on the entire Connecting Parcel in 1993.[156] The Szelestei family and hunters have hunted on the Connecting Parcel since that time.[157]

---

[154] *Tumulty v. Schreppler*, 132 A.3d 4, 27 (Del. Ch. 2015) (internal quotation marks and citations omitted).

[155] *Id.* at 28.

[156] *See supra* note 152.

[157] Trial Tr. 116:12-15. William Szelestei, Szelestei's grandson, testified that he hunts deer and turkeys on the Connecting Parcel. *Id.* 106:14-20. The leader of one of the hunting clubs, Ronald Malice ("Malice"), described his rights extending to the "tree with a pipe coming out of it." *Id.* 121:2-5. While there was some confusion about references on the map used at trial for demonstrative purposes, *see id.* 120:1-22, the descriptions given in Malice's testimony indicated that he and his hunting club hunted on the Gibbs Parcel and the Disputed Parcel. The "tree with a pipe coming out of it" is the marker that separates the Disputed Parcel from Szelestei's land that adjoins Butterpat Road. And, in my personal observations of the properties, I observed the tree stand of a member of Malice's club on the Disputed Parcel.

The Melvilles argue that "the location of most if not all of the stands rented by the Szelesteis seemed, based on the testimony of the two hunters who testified, to have been on the parcels located to the north and south of the Disputed Parcel." D.I. 52, at 18. For

32

And, Melville knew that the Szelesteis' hunters were on the Disputed Parcel.[158] The Szelesteis' hunters put signs up on their trails and deer stands to mark them.[159] The Szelesteis and their hunters cleared a 10-12 foot wide trail in the Disputed Parcel and the Gibbs Parcel.[160] The Szelesteis have maintained the trail.[161] Melville used the trail at times and knew that the Szelesteis were maintaining the trail.[162] Additionally, at least on one occasion, the Szelesteis put up "No Trespassing" signs to prevent unauthorized persons bringing all-terrain vehicles through, and damaging, the Szelesteis' properties, including the Gibbs Parcel and the Disputed Parcel.[163]

Szelestei and her agents made no secret of their use of the Disputed Parcel and the Gibbs Parcel. However, like the lands at issue in *Tumulty v. Schreppler*,[164] these properties are secluded and landlocked. The Court in *Tumulty* found that the adverse possessor had met his burden of showing an open and notorious use based upon the

---

the reasons discussed in the preceding paragraph, I disagree with that characterization of the evidence.

[158] Trial Tr. 368:23-369:18; *see also id*. 372:19-24. Melville testified that he moved the Szelesteis' hunters off the Disputed Parcel one time, but it appears this action occurred after this litigation was instituted. *Id*. 372:19-24.

[159] *Id*. 124:19-24; *id*. 125:13-15. Additionally, I observed such a sign on Mr. Johnson's deer stand on the Disputed Parcel.

[160] *Id*. 62:16-20; *see id*. 89:11-91:13.

[161] *Id*. 89:15-17; *see also id*. 89:19-20; *id*. 91:4-16; *id*. 132:9-15.

[162] *Id*. 375:5-10; *id*. 376:22-23; *id*. 377:22-378:3.

[163] *Id*. 378:22-379:5.

[164] 132 A.3d 4, 28 (Del. Ch. 2015).

33

activities that the adverse possessor conducted on the land, which included hunting, fishing, camping, cutting trials, inviting friends to do the same, and making some efforts to exclude trespassers.[165] Similarly here, the Szelesteis hunted on the Disputed Parcel and the Gibbs Parcel, cut trails on both parcels, and licensed hunters to do the same. Additionally, the Szelesteis put up no trespassing signs when necessary to exclude others from damaging the properties. Thus, Szelestei has proven open and notorious use by a preponderance of the evidence.

3. Actual Possession

"The requirement of actual possession overlaps to a large extent with open and notorious possession."[166] The inquiry is whether "the possession comports with the usual management of similar lands by their owners."[167] "Neither the actual occupation, cultivation, nor residence is necessary where neither the situation of the property nor the use to which it is adapted or applied admits of, or requires, such evidence of ownership."[168]

The Szelesteis began selling hunting rights on the Gibbs Parcel and the Disputed Parcel in 1993.[169] They also hunt on the properties whatever they are

---

[165] *Id*. at 30.

[166] *Id*.

[167] *Id*. (quoting *Marvel v. Barley Mill Road Homes*, 104 A.2d 908, 912 (Del. Ch. 1954)).

[168] *Id*. (quoting *Marvel*, 104 A.2d at 912) (emphasis omitted).

[169] *See supra* note 152.

34

allowed to hunt pursuant to Delaware state law.[170] The hunters whom the Szelesteis license similarly hunt what and when they are allowed under Delaware state law.[171] When there is no active hunting season, there is not much activity on the properties, except maintenance by either the Szelesteis or the hunting clubs.[172]

Szelestei, through this conduct, has proven actual possession by a preponderance of evidence. "Delaware law consistently has recognized that 'recreational' usage can support an adverse possession claim."[173] Even though the Szelesteis and their agents made little use of the Connecting Parcel outside of the hunting season, this is sufficient under Delaware law for a claim of adverse possession.[174] The Szelesteis used the parcels in a manner as an owner of comparable lands would. And, they, and their agents, made use of the properties throughout – the trail cut by the Szelesteis runs along the western boundary of these parcels, and the deer stand of one of their hunters is near the southeast corner of the Disputed Parcel, as indicated by the iron axle. Thus, the Szelesteis have shown actual possession by a preponderance of the evidence.

---

[170] Trial Tr. 106:14-107:11.

[171] *Id*. 141:5-14.

[172] *Id*. 107:24-108:12.

[173] *Tumulty*, 132 A.3d at 31.

[174] *See id*. at 30-32; *see also id*. at 26 (the adverse possessor "used the land as a weekend getaway").

## 4. Exclusive Possession

"The exclusivity element does not require absolute exclusivity."[175] "Exclusive possession means that the adverse possessor must show exclusive dominion over the land and an appropriation of it to his or her benefit."[176] "Possession is exclusive when the claimant's possession excludes the record owner and the public."[177]

Beginning in 1993, the Szelesteis licensed hunters to hunt on the Disputed Parcel and the Gibbs Parcel; these hunters paid the Szelesteis annually for their hunting rights.[178] The Szelesteis would enforce their hunting rights and get involved if persons whom they had not granted hunting rights to came onto the property.[179] By licensing others to hunt on the Disputed Parcel and the Gibbs Parcel – and appropriating the economic value of those properties to their benefit – the Szelesteis exercised exclusive possession over the entire Connecting Parcel.[180]

---

[175] *Id.* at 26.

[176] *Id.* (quoting *Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Ch. Aug. 31, 2007)) (internal quotation marks omitted).

[177] *Berger v. Colonial Parking, Inc.*, 1993 WL 208761, at *2 (Del. Ch. June 9, 1993), *as modified*, 1993 WL 257329 (Del. Ch. July 2, 1993); *see also Tumulty*, 132 A.3d at 27 ("An ordinary landowner may experience trespasses on her land; promptly excluding such individuals upon discovery reinforces a claim of exclusive ownership.")

[178] Trial Tr. 62:1-6. *See*, *e.g.*, Pet'r Tr. Ex. 28; Trial Tr. 122:10-23.

[179] Trial Tr. 94:15-18.

[180] *See Walker v. Five N. Corp.*, 2007 WL 2473278, at *4 (Del. Ch. Aug. 31, 2007).

The Melvilles argue that Szelestei cannot meet the burden of showing exclusive use because the Melvilles also used the Disputed Parcel.[181] Specifically, the Melvilles and their family had a deer stand on the Disputed Parcel, hunted on the Disputed Parcel, and used the Disputed Parcel to traverse between their properties.[182] In 2017, the Melvilles planted trees on the Disputed Parcel, on the advice of the state forestry service.[183] They have also asked one of the Szelesteis' hunters to leave the Disputed Property.[184] But, the actions that would most strongly detract from a finding of exclusive possession arose after 2013, which is beyond Szelestei's 20-year period for adverse possession, which began accruing in 1993. The Melvilles and their associates did have a deer stand on the Disputed Parcel as early as 2001, but I do not find that this negates a finding of exclusive possession since the deer stand was along the property line.[185] This minor incursion onto the Disputed Parcel, in a heavily forested area where property boundaries are not entirely clear, does not alone defeat Szelesteis' exclusive possession.[186]

---

[181] D.I. 52, at 17-20.

[182] Trial Tr. 361:9-22; *id.* 419:6-18. "As a kid, we used to hunt back through [the Gibbs Parcel and the Disputed Parcel]. There weren't very many boundary issues, I guess, at that point." *Id.* 370:5-7.

[183] *See id.* 362:21-24; *id.* 363:9-14.

[184] *Id.* 372:19-24.

[185] *Id.* 397:9-398:14.

[186] *See Tumulty v. Schreppler*, 132 A.3d 4, 26-27 (Del. Ch. 2015). Delaware law recognizes that "mixed possession" does not necessarily defeat a claim of adverse possession. *See Edwards v. Est. of Muller*, 1993 WL 489381, at *13 (Del. Ch. Oct. 18, 1993). "Where

## 5. Hostile Possession

"A hostile claim goes against the claim of ownership of all others, including the record owner."[187] "It is not necessary that one entering a property must expressly declare his intention to take and hold the property as his own. The actual entry upon and the use of the premises as if it were his own, to the exclusion of all others, is sufficient."[188] The Szelesteis have maintained the Gibbs Parcel and the Disputed Parcel using heavy equipment, which can be heard from neighboring properties.[189] No evidence was presented that the Szelesteis used the Gibbs Parcel and the Disputed Parcel with permission from some record owner. Thus, Szelestei has met her burden of showing hostile possession.

In conclusion, Szelestei has established, by preponderance of the evidence, title to the Gibbs Parcel and the Disputed Parcel through adverse possession.

---

there has been 'mixed possession,' that is, where both parties have demonstrated acts of ownership over time, then the party who has shown legal title enjoys the right of possession." *Id.* (quoting *Nevin v. Disharoon*, 66 A. 362, 363 (Del. Super. 1907)). Here, because I hold that neither party enjoys legal title to the Disputed Parcel, this rule does not apply. Unresolved by this Report is whether the Melvilles have any type of property right in the Disputed Parcel. Unlike Szelestei, the Melvilles claimed only legal title to the Disputed Parcel in this action. *See* D.I. 7, ¶¶ 27-30. There was evidence that the Melvilles, their family, and associates have accessed the Connecting Parcel for generations. *See* D.I. 52, at 17-18; Trial Tr. 422:2-15. It may be that their use has ripened into an easement or other interest; however, that issue is not properly before the Court at this time.

[187] *Tumulty*, 132 A.3d at 27 (cleaned up).

[188] *Id.* (cleaned up).

[189] Trial Tr. 91:13-19.

## D.  Attorneys' Fees

Both parties have requested fee-shifting under the bad faith exception to the American Rule.[190]  Both argue that the other has acted in bad faith by taking actions to claim ownership of the Disputed Parcel while knowing the other has a justifiable claim of right to the parcel.[191]  "Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation."[192]  Equitable exceptions to the American Rule include the bad faith exception.[193]  I find no evidence that either party has acted in bad faith in this litigation – both parties advanced non-frivolous claims for their ownership of the Disputed Parcel – and I decline to shift fees.

---

[190] *See* D.I. 1, ¶¶ 23-26; D.I. 7, ¶¶ 31-38.  In the pre-trial stipulation, the Melvilles stated that their attorney's fees request was under 10 *Del. C.* § 348(e). D.I. 29, at 5.  However, this litigation is not related to deed restrictions, so Section 348(e) does not apply. *See* 10 *Del. C.* § 348(e).

[191] *See* D.I. 1, ¶¶ 23-26; D.I. 7, ¶¶ 31-38.

[192] *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017); *see also ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014); *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[193] Delaware courts have awarded attorney's fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)); *see also RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (citation omitted).

### III. Conclusion

For the reasons set forth above, I recommend that the Court quiet title on the Connecting Parcel, including the Disputed Parcel and the Gibbs Parcel, in favor of the Steve Szelestei, Jr. Revocable Trust Dated August 14, 2009. I also recommend that the Court decline to shift attorneys' fees. This is a final master's report, and the parties may take exceptions under Court of Chancery Rule 144. Within 15 days after this report becomes final, I ask the parties to submit a proposed implementing order.